225 N.J. Super. 250 (1988)
542 A.2d 44
RICHARD J. D'AGOSTINO, PLAINTIFF-APPELLANT,
v.
JOHNSON & JOHNSON, INC., ROBERT N. WILSON AND RONALD G. GELBMAN, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted May 2, 1988.
Decided June 3, 1988.
*252 Before Judges DREIER and BAIME.
Lasser, Hochman, Marcus, Guryan and Kuskin, and Kaplan, Russin & Vecchi, for appellant (Barry Eisenberg and Douglas V. Rigler on the brief).
Riker, Danzig, Scherer, Hyland & Perretti, for respondents (Douglas S. Eakeley of counsel; Nicholas DeB. Katzenbach and Laura J. Berkowitz on the brief).
The opinion of the Court was delivered by BAIME, J.A.D.
*253 Plaintiff Richard J. D'Agostino instituted this action to obtain compensatory and punitive damages against Johnson & Johnson, Inc. (J & J), Robert Wilson, the vice-chairman of its executive committee, and Ronald Gelbman, president of Ortho Diagnostic Systems, Inc., a corporate affiliate, alleging that they directed Cilag AG (Cilag), J & J's wholly owned Swiss subsidiary, to terminate his employment when he refused to approve the payment of bribes to a leading Swiss governmental official. In his complaint, plaintiff also claimed that defendants issued defamatory statements concerning the reason for his dismissal and that they entered into an unlawful conspiracy to prevent him from obtaining employment with other companies in the pharmaceutical industry. The Superior Court, Law Division, conditionally dismissed plaintiff's complaint on the basis of forum non conveniens. We reverse.
Certain prefatory comments are in order. The factual background of this litigation is hotly contested. The briefs submitted to us, although otherwise providing an excellent exposition of the law, are pregnant with charges, counter-charges and hyperbole. We emphasize that discovery proceedings had not yet commenced when the order dismissing the complaint was entered and, of course, no evidentiary hearing was ever conducted. Our recitation of the facts thus rests upon the pleadings, affidavits and certifications contained in the paltry record before us. By our recital of the parties' respective allegations and contentions, we, of course, do not offer any opinion as to their accuracy.
Plaintiff, an American citizen born in Newark, New Jersey, has apparently resided in Switzerland for some time and currently lives in the city of Aubonne. On April 15, 1985, plaintiff was hired by Cilag to serve as general manager of marketing in Switzerland. The written employment agreement provided that the canton of Shaffhausen was the "agreed upon local place of venue for disputes arising out of the contract" and that the *254 "Swiss Obligation Law [was to] apply." In addition, plaintiff executed a document requiring him to return all confidential materials in his possession to Cilag upon his termination.
From the commencement of his employment with Cilag, the ability to obtain Swiss approvals for new drugs in an expeditious manner was emphasized as a "mandatory aspect" of plaintiff's employment. In Switzerland, the process of drug registration involves filing an application with the Intercantonal Office for the Control of Medicaments (IOCM). Evaluation of applications is undertaken by the IOCM's "college of experts," a panel which examines specific medical questions relating to the approval of new products.
In 1985, Dr. Rudolph Preisig was the president of the college of experts. Preisig was also president of the "reception committee," a body which reviews and screens all applications for registration and either rejects them at the outset or forwards them to the college for further evaluation. According to plaintiff, Preisig exerted substantial control over the initial and final determination pertaining to all Swiss pharmaceutical registration applications. His pivotal role was further accentuated by the fact that Swiss approval apparently has great weight on the determinations of other European countries concerning the registration of new drugs.
At the time plaintiff commenced his employment with Cilag, J & J was seeking to obtain Swiss registration of a synthetic hormone known as Imunox. J & J's prior applications had been denied twice in the past by IOCM, based upon the insufficiency of the clinical data submitted. Because of these difficulties, plaintiff, Dr. Hans Schmid, a vice-president of J & J International, and Dr. H.U. Balthaser, the doctor coordinating the Swiss registration efforts, met personally with Wilson at J & J's headquarters in New Brunswick, New Jersey. At the meeting, Wilson purportedly stressed the importance of obtaining Swiss registration for Imunox in order that the drug could *255 be quickly registered in other nations by Cilag's affiliate, Cilag International.
On June 24, 1985, a payment order was submitted to plaintiff for his approval. The order was for 20,000 Swiss francs (approximately $12,500), with payment to be made in favor of Preisig. Although the payment was described as a "consultant fee," plaintiff harbored suspicions that its purpose was to influence Preisig in obtaining approval of Cilag's pending registration applications. Plaintiff claimed that confidential, internal J & J memoranda, several of which he later attached to his complaint as exhibits, disclosed the true objective of the arrangement between Cilag and Preisig.
At this time, plaintiff also received an internal memorandum from Balthaser noting that Preisig had complained because he had not received his fee. Plaintiff refused to authorize this payment. He was then informed of an agreement, dated November 20, 1984, between various Cilag divisions, allocating among them the cost of the amounts to be paid to Preisig. On the following day, a smaller payment order for Preisig was presented to plaintiff for his approval, but he again refused. This was repeated on July 23, 1985. Plaintiff declined to authorize payment of any amounts to Preisig and was discharged the next day.
The letter of termination was signed by Schmid on stationery bearing the address of J & J International in New Brunswick. In his complaint, plaintiff contends that his discharge was orchestrated and directed by defendants and that such conduct occurred primarily in New Jersey. Plaintiff also claims that when he was fired J & J promised to place him somewhere else in the corporation. It is undisputed, however, that plaintiff was presented with a termination agreement which was silent on this question. Although plaintiff accepted its principal terms, the payment of severance compensation and the use of a corporate automobile for a limited period, he refused to sign the document and now asserts that it was "coercive."
*256 At the time of his discharge, plaintiff apparently publicized his claim that his termination was the result of his refusal to authorize improper payments to Preisig. Several newspaper articles were published describing plaintiff's allegations in some detail. Plaintiff asserts that after he was fired he wrote to Gelbman at the latter's office in New Jersey, requesting assistance in finding another position with J & J. In a curt reply, Gelbman refused, recommending that plaintiff start anew with another company. Plaintiff contends that defendants entered into a conspiracy to prevent him from obtaining employment with other companies in the pharmaceutical industry and that they issued defamatory statements misrepresenting the cause of his discharge.
Sometime in May of 1986, plaintiff's attorney contacted J & J and threatened to institute a lawsuit. In the course of these discussions, certain confidential Cilag documents were presented by plaintiff to J & J. According to plaintiff's allegations, representatives of J & J asked that he forbear commencing a legal action pending further discussions pertaining to a possible settlement. On the other hand, defendants deny this allegation and assert that they immediately rejected what they regarded as plaintiff's extortionate demands.
In any event, on October 31, 1986, Cilag brought an action in the Schaffhausen Canton, Switzerland, seeking a declaratory judgment of its rights under its contract with plaintiff. Plaintiff asserts that this action was designed as a preemptive strike to prevent the filing of a suit in New Jersey, where our discovery rules are far more liberal and our substantive law regarding wrongful discharge more favorable.
On November 4, 1986, Cilag obtained a "provisional" injunction directing plaintiff to return all Cilag documents. The injunction, which became permanent on December 22, 1986, also prohibits plaintiff from disclosing to anyone the confidential information which they purportedly contain.
*257 In the interim, plaintiff filed his complaint in this action on December 4, 1986. Defendants moved to dismiss on the basis of the doctrine of forum non conveniens and comity. In their motion, defendants asserted that the Swiss government permits IOCM officials to engage in consulting agreements with drug companies having registration applications pending, subject to full disclosure. They pointed out that plaintiff's allegations had been the subject of a criminal investigation by prosecutorial authorities in Switzerland and were found to be totally lacking in merit. They claimed further that they had filed prorogation statements and powers of attorney with the Cantonal Court of Schaffhausen, thereby agreeing to submit to that forum's jurisdiction. Finally, they contended that virtually all of the prospective witnesses resided in Switzerland, relevant Cilag documents could be found there, plaintiff, by virtue of his employment contract, had agreed to submit to the Shaffhausen venue and that Swiss law was applicable.
In a letter opinion, the trial court determined that the doctrine of forum non conveniens compelled dismissal of plaintiff's complaint. The court's conclusion was predicated upon its belief that all of the witnesses of the original incident regarding plaintiff's discharge resided in Switzerland or Germany, that plaintiff is a long-time Swiss resident and that the propriety of the payments to Preisig would require application of Swiss law. The court conditioned its order dismissing the complaint upon the stipulation that defendants would submit themselves to the jurisdiction of the appropriate court in Switzerland and would not interpose any defense based upon plaintiff's failure to file a complaint in timely fashion.
Following entry of the order and during the pendency of this appeal, plaintiff moved to remand the matter to the Law Division for supplementation of the record. We granted plaintiff's motion for a remand and directed that a hearing be conducted relating to D'Agostino's assertion that defendants, contrary to their promise, had refused to submit to the jurisdiction of the Shaffhausen court. At the hearing, plaintiff introduced *258 into evidence a brief that had been filed by defendants in the declaratory judgment action in which they objected to being impleaded as parties plaintiff. In the brief, defendants asserted that the action in Shaffhausen concerned only plaintiff's contractual rights under his employment contract with Cilag, that they were not parties to this agreement and that plaintiff's allegations against them rested upon tort theories which, under Swiss law, could not properly be joined. We note, however, that in the same brief defendants conceded plaintiff could institute a separate action against them. In that event, "if and when such suit is brought," defendants stated that they would "address the question whether they [would be] proper party-defendants." Defendants' motion objecting to plaintiff's "interpleader" application was granted by the Shaffhausen court.
Following the remand hearing, the trial judge determined that the new evidence submitted by plaintiff did not in any sense alter his prior decision dismissing the action. In essence, the court found that defendants had objected to being impleaded as plaintiffs based upon procedural grounds and had not refused to submit to the jurisdiction of the Shaffhausen court.
Plaintiff argues on appeal that the doctrine of forum non conveniens was improperly applied by the trial court because (1) the Shaffhausen canton does not constitute an "available" and an "adequate" forum for resolving the issues raised by his claim against defendants and (2) private and public interest factors were incorrectly weighed in favor of divesting the New Jersey courts of jurisdiction. We consider these contentions in seriatim.

I.
The doctrine of forum non conveniens, an equitable principle, is firmly embedded in the law of this State, see, e.g., Civic Southern Factors v. Bonat, 65 N.J. 329, 332-333 (1974); Wangler v. Harvey, 41 N.J. 277, 286 (1963); Starr v. Berry, 25 N.J. 573, 583-585 (1958); Vargas v. A.H. Bull Steamship Co., *259 25 N.J. 293, 295 (1957), cert. den. 355 U.S. 958, 78 S.Ct. 545, 2 L.Ed.2d 534 (1958); Gore v. United States Steel Corp., 15 N.J. 301, 310-311 (1954), cert. den. 348 U.S. 861, 75 S.Ct. 84, 99 L.Ed. 678 (1954), and elsewhere, see Piper Aircraft Co. v. Reyno, 454 U.S. 235, 248 n. 13, 102 S.Ct. 252, 262 n. 13, 70 L.Ed.2d 419, 431 n. 13 (1981), reh'g den. 455 U.S. 928, 102 S.Ct. 1296, 71 L.Ed.2d 474 (1982); Blair, "The Doctrine of Forum Non Conveniens in Anglo-American Law," 29 Colum.L.Rev. 1 (1929). Although phrased in a variety of ways, the essence of the doctrine is that a court may decline jurisdiction whenever the ends of justice indicate a trial in the forum selected by the plaintiff would be inappropriate. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055, 1062 (1947); Koster v. Lumbermens Mutual Cas. Co., 330 U.S. 518, 527, 67 S.Ct. 828, 833, 91 L.Ed. 1067, 1075 (1947); Civic Southern Factors v. Bonat, supra, 65 N.J. at 332-333. The principle is often invoked to protect the private interests of the litigants, such as availability of witnesses and the ease of access to other sources of proof. Semanishin v. Metropolitan Life Ins. Co., 46 N.J. 531, 533 (1966). However, public interest factors also must be weighed. Gulf Oil Co. v. Gilbert, supra, 330 U.S. at 508, 67 S.Ct. at 843, 91 L.Ed. at 1062.
We will shortly review these factors with particularity. We merely observe here that the necessary predicate to application of the doctrine is the existence of another forum where trial will best serve the convenience of the parties and the ends of justice. Civic Southern Factors v. Bonat, supra, 65 N.J. at 333; Wangler v. Harvey, supra, 41 N.J. at 286; Gore v. United States Steel Corp., supra, 15 N.J. at 311. Stated somewhat differently, the doctrine presupposes at least two forums in which the defendant is amenable to process. Wangler v. Harvey, supra, 41 N.J. at 286.
In that context, plaintiff contends that the availability of the Shaffhausen court for resolution of the issues presented by this claim should not be made to depend merely upon the will or *260 grace of the defendants, but must be provided by law. The identical argument was considered and rejected in Vargas v. A.H. Bull Steamship Co., 44 N.J. Super. 536, 542-543 (Law Div. 1957), aff'd 25 N.J. 293 (1957), cert. den. 355 U.S. 958, 78 S.Ct. 545, 2 L.Ed.2d 534 (1958). Suffice it to say, no authority has been submitted, nor has our independent research disclosed any, in which application of the doctrine has been refused to a defendant who agreed to accept service and submit to jurisdiction, solely because such submission constituted a voluntary act rather than an obligation imposed by law.
We are equally unpersuaded by plaintiff's contention that defendants, contrary to their representation to the trial court, subsequently refused to submit to the jurisdiction of the Shaffhausen court. In the trial court, defendants expressly pledged themselves to accept process in Switzerland. Therefore, the court's focus was on whether it should relinquish its hold of the present litigation based on defendants' promise to voluntarily submit to the jurisdiction of the foreign forum. Our careful study of the translations of the proceedings before the Shaffhausen court satisfies us that defendants did not repudiate their representation or promise to accept service of process in Switzerland. The fact that the Shaffhausen court refused to implead defendants as plaintiffs in the declaratory judgment action brought by Cilag does not in any sense militate against this conclusion. In denying plaintiff's motion, the Shaffhausen court predicated its decision on the procedural impropriety of joining independent claims resting on different legal theories in a single action. The court explicitly recognized plaintiff's option to institute a separate legal action against defendants. In that regard, the court specifically alluded to the fact that defendants had submitted a prorogation declaration in which they undertook to "accept the jurisdiction of the Swiss courts to hear claims [plaintiff] might assert against them." While it is true that portions of defendants' brief submitted to the Shaffhausen court appear to equivocate upon whether they would be proper parties were an action instituted against them by plaintiff, *261 we regard such expressions as manifestations of normal lawyerly caution in preserving and safeguarding the rights of clients. In short, we discern no basis for plaintiff's accusation that defendants deliberately deceived the trial court and now refuse to submit to the jurisdiction of the Shaffhausen court.
We also reject plaintiff's argument that the Shaffhausen court would not fairly consider the merits of his claim in the event he were to bring a separate action against defendants in Switzerland. In support of his position, plaintiff points to the restrictive discovery rules applicable in the Shaffhausen canton and the paucity of attorneys willing to challenge the power of J & J and its subsidiaries in that jurisdiction. Notwithstanding the intimation by plaintiff to the contrary, we assume that the Shaffhausen court system is fully equipped to insure his fair and equal treatment.
We thus find no support in the record for plaintiff's argument that the courts of Switzerland do not provide an adequate forum for resolution of his claim against defendants.

II.
We now address plaintiff's assertion that the trial court mistakenly exercised its discretion by dismissing his complaint. We find merit in this argument and are, therefore, constrained to reverse.
Although the doctrine of forum non conveniens is of ancient lineage, see Piper Aircraft Co. v. Reyno, supra, 454 U.S. at 248 n. 13, 102 S.Ct. at 262 n. 13, 70 L.Ed.2d at 431 n. 13; Gore v. United States Steel Corp., supra, 15 N.J. at 305, it has received intensive consideration in recent years. Starr v. Berry, supra, 25 N.J. at 583. Today, many transactions, commercial and tortious, have evidential roots in several jurisdictions. Starr v. Berry, supra, 25 N.J. at 587. It is important, therefore, that the controlling test "should be practicable as well as inherently just." Ibid. The doctrine should never be applied offensively to embarrass or destroy a claimant's opportunity to *262 be heard. If only a weighing of the relative conveniences were involved, "motions to dismiss would become the usual thing in all such cases, thus diverting the energies of counsel and the courts to quarrels over venue considerations." Ibid. While we recognize the need for flexibility, we must take care to insure that cases are not shuttled between jurisdictions upon discordant determinations, especially where the prospect of a lengthy or complex trial offers a strong temptation to decline to entertain the suit.
As we have pointed out, the present tendency is to avoid a rigid formula and to weigh sundry factors, both private and public, which bear upon the justness of a plaintiff's choice. Nevertheless, "emphasis continues upon the element of harassment and vexation notwithstanding reference also to the element of trial convenience." Id. at 584. There, thus, has emerged over the years the principle that plaintiff's choice may not be defeated upon a mere balance of conveniences. Ibid. Consequently, "a plaintiff's choice of forum ordinarily will not be disturbed except upon a clear showing of real hardship or for some other compelling reason." Civic Southern Factors v. Bonat, supra, 65 N.J. at 333. Dismissal of a complaint is unwarranted unless the plaintiff's choice is shown to be "demonstrably inappropriate." Ibid.
There is a strong presumption in favor of retaining jurisdiction where the plaintiff is a resident who has chosen his home forum. Piper Aircraft Co. v. Reyno, supra, 454 U.S. at 256 n. 24, 102 S.Ct. at 266 n. 24, 70 L.Ed.2d at 436 n. 24. A nonresident's choice of forum is entitled to substantially less deference. Ibid. However, domestic residence is not decisive. The doctrine of forum non conveniens "is non-discriminatory and does not turn on considerations of domestic residence or citizenship...." Gore v. United States Steel Corp., supra, 15 N.J. at 311. Instead, "[i]t is only in those exceptional cases where a weighing of all of the many relevant factors, of which residence is but part, decisively establishes that there is available *263 another forum where trial will best serve the convenience of the parties and the ends of justice, that the doctrine is ever invoked." Ibid.
The seminal United States Supreme Court decision pertaining to the doctrine of forum non conveniens is Gulf Oil Corp. v. Gilbert, supra. There, the Court posited eight factors which should be weighed in making a choice between forums. The Court identified four "private interest" factors: (1) the relative ease of access to sources of proof, (2) the availability of compulsory process for attendance of unwilling witnesses and the cost of obtaining the attendance of willing witnesses, (3) whether a view of the premises is appropriate to the action and (4) all other practical problems that make trial of a case "easy, expeditious and inexpensive," including the enforceability of the ultimate judgment. 330 U.S. at 508, 67 S.Ct. at 843, 91 L.Ed. at 1062. In addition, the Court referred to the following "public interest" factors: (1) the administrative difficulties which follow from having litigation "pile up in congested centers" rather than being handled at its origin, (2) the imposition of jury duty on members of a community having no relation to the litigation, (3) the local interest in the subject matter such that affected members of the community may wish to view the trial and (4) the local interest "in having localized controversies decided at home." 330 U.S. at 508-509, 67 S.Ct. at 843, 91 L.Ed. at 1062-1063.
Against this conceptual framework, we are convinced that plaintiff's choice of forum was not shown to be "demonstrably inappropriate." Civic Southern Factors v. Bonat, supra, 65 N.J. at 333. Nor did defendants satisfy their burden of establishing that plaintiff's choice was designed to subject them to "harassment and vexation." Starr v. Berry, supra, 25 N.J. at 584.
Our review of the sparse record provides no support for the trial court's conclusion that a weighing of the private interest factors identified in Gulf Oil Corp. v. Gilbert, supra, militates *264 in favor of dismissing plaintiff's action. Rather, we are of the view that several of the factors favor prosecution of the litigation in New Jersey and that others are neutral.
The trial court determined that the evidence is more accessible in Switzerland than in New Jersey. However, this is obviously true with respect to some issues, but not as to others. The principal thrust of plaintiff's claim is that defendants orchestrated his dismissal from J & J's central headquarters in New Brunswick. Moreover, plaintiff contends that defendants conspired to "blacklist" him and bar his employment by other companies in the pharmaceutical industry. The complaint, which at times is somewhat opaque, suggests that these activities occurred in New Jersey. Succinctly stated, it is by no means clear that Switzerland provides greater access to relevant evidence than New Jersey.
The trial court also found that a majority of witnesses are located in Switzerland. However, it is extremely difficult to evaluate this factor until the pretrial process is completed. As we have pointed out, the complaint is broad and sweeping. We have the impression that when the preliminaries have concluded, the issues will be narrowed. At this posture, it is plain that because of the multi-national nature of J & J's operations, important witnesses reside in Switzerland, Germany and the United States. We note that most of the foreign witnesses are agents of J & J and, therefore, are under its command. In any event, the record does not support the trial court's conclusion that "virtually all" of the principal witnesses reside in European countries.
The conduct of this litigation would generate practical problems whether tried in Switzerland or in New Jersey. While it is undoubtedly true that several of the witnesses are Swiss or German, others are American. As noted by plaintiff, witness language problems would exist on either continent. We discern no sound basis for the conclusion that it would be "easier" to have the case tried in Switzerland rather than here.
*265 So too, a weighing of the public interest factors does not favor application of the doctrine of forum non conveniens. The first factor, recognition of our congested court calendars, was not expressly considered by the trial court. While we are fully aware of the burgeoning number of cases in New Jersey, the record is barren of anything to suggest that court congestion does not exist in Switzerland or that the trial would be reached more expeditiously in that country. In any event, it would be grossly unfair to dismiss cases having evidential roots in New Jersey simply on the basis of our crowded civil court dockets.
The remaining public interest factors, the imposition of jury duty on members of a community, the ability of the local community to participate in the proceedings and the local interest in the subject matter, all pertain to the nature and extent of the forum's concern in the litigation. Obviously, Switzerland has a strong policy interest in protecting the integrity of its drug registration process. However, New Jersey has an equally compelling interest in preserving the job security of employees who refuse to engage in unethical or illegal conduct. The importance this state attaches to this interest is best evidenced by the recently enacted Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq., and by our case law, see, e.g., Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980). In New Jersey, we are deeply committed to the principle that an employer's right to discharge an employee carries a correlative duty to protect his freedom to decline to perform an act that would constitute a violation of a clear mandate of public policy. Id. at 72. See also Foreign Corrupt Practices Act, 15 U.S.C. 78dd-1 et seq. Even were this otherwise, New Jersey would nevertheless have a strong policy interest in providing legal redress to a person who has been the subject of a defamatory attack in furtherance of a conspiracy to bar him from employment. Plaintiff contends that defendants committed these acts and that much of this unlawful conduct occurred in New Jersey. Of course, we have no occasion to consider the truth or *266 falsity of these allegations. The overriding fact is, however, that these are the allegations that have been made, and New Jersey has an obvious interest in providing the parties the requisite forum for resolution of the controversy.
This is not a case of "extraterritoriality run wild," as defendants suggest in their brief. We perceive no difficult choice of law problem here. The issue is not whether Preisig could, consistent with Swiss law, accept consulting fees from companies having drug registration applications pending before the IOCM. While such a practice might well offend our notions of propriety in New Jersey, it apparently does not contravene the conflict of interest laws of Switzerland.[1] However, plaintiff's contention is not that he refused to authorize payments to Preisig simply because Preisig was a member of the IOCM. Rather, he claims that he declined to approve such payments because the consulting agreement constituted a mere subterfuge for the passing of bribes. As we understand his contention, plaintiff asserts that the fees to be paid to Preisig were designed to influence him in his consideration of Cilag's drug registration statements. He claims that he refused to participate in a scheme which he reasonably believed constituted bribery, a crime under Swiss law as it is here. Plaintiff contends that defendants engineered his firing because of his refusal and that they embarked upon a conspiracy to defame him and deprive him of his right to work. Many of these acts are alleged to have occurred in New Jersey and we discern no justifiable basis to deny plaintiff this state's forum.
*267 Accordingly, the order of the Law Division dismissing plaintiff's complaint is reversed.
NOTES
[1] We recognize that, under the employment agreement, questions concerning interpretation of the contract are to be determined by applying the Swiss Obligation Law and that Shaffhausen is the designated venue for resolving issues of that nature. The instant case is a tort action, however, based upon claims of wrongful discharge, conspiracy and defamation. The majority of the tortious acts alleged to have been committed occurred in New Jersey. We cannot fairly say, under these circumstances, that plaintiff's choice of forum was vexatious or designed to harass the defendants.