924 A.2d 571 (2007)
393 N.J. Super. 459
Carlos Alberto AGUERRE, Hugo Archimbal, Hector Hugo Caamaño and Maria Cristina Fernandez, Plaintiffs-Appellants,
v.
SCHERING-PLOUGH CORPORATION, a New Jersey Holding Company; Alfred M. Blanco, Individually and in His Capacity as an Officer of Schering-Plough Corporation; Jorge P. Forton, Individually and as an Officer of Schering-Plough Corporation; Burton D. Hunter, Individually and as a Senior Legal Director, International Law of Schering-Plough Corporation; Thomas C. Lauda, Individually and in His Capacity as an Officer of Schering-Plough Corporation; Dalton E. Smart, III, Individually and in His Capacity as an Officer of Schering-Plough Corporation, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued January 24, 2007.
Decided May 25, 2007.
*573 Alan S. Lewis of the New York Bar, admitted pro hac vice, argued the cause for appellants (Buchanan Ingersoll and Rooney and Bruce S. Koppel, attorneys; Mr. Lewis and Andrew K. Lipetz, on the brief).
Francis X. Dee argued the cause for respondents (McElroy, Deutsch, Mulvaney & Carpenter, attorneys; Mr. Dee, of counsel; Mr. Dee and Thomas C. Bigosinski, Morristown, on the brief).
Before Judges WEFING, PARKER and MESSANO.
The opinion of the court was delivered by
PARKER, J.A.D.
Plaintiffs Carlos Alberto Aguerre, Hugo Archimbal, Hector Hugo Caamaño and Maria Cristina Fernandez appeal from two orders, one entered on July 28, 2004 granting summary judgment dismissing their third amended complaint; and the other entered on December 10, 2004 denying their motion for reconsideration. We affirm the trial court's dismissal of the defamation claims but reverse the dismissal of all other claims and remand for further proceedings.

I
The four plaintiffs were long-term employees of Laboratorios Essex S.A. (Essex), *574 the Argentinean subsidiary of defendant Schering-Plough Corporation (Schering-Plough). Plaintiffs allege that they were abruptly terminated from Essex after disclosing "widespread unethical and illegal marketing and sales practices." The individual defendants, Alfred M. Blanco, Jorge P. Forton, Thomas C. Lauda and Dalton E. Smart, III, are officers of Schering-Plough and defendant Burton D. Hunter is the Senior Legal Director.
Plaintiffs alleged that Schering-Plough engaged in "the pervasive and routine bribing of doctors and public officials" in order "to maximize sales of its anti-infective and anti-cancer products" in Argentina. They allege further that defendants violated the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to - 14, in terminating them because of their disclosures. Although all of the plaintiffs executed settlement agreements (agreements) with releases after their terminations in 2002 and 2003, they claim that they were coerced into entering the agreements because defendants threatened to have them blacklisted from other employment in the industry. Plaintiffs maintain that even though they signed the agreements, defendants defamed them to prospective employers, preventing them from obtaining new employment in the pharmaceutical industry.
Plaintiff Carlos Alberto Aguerre worked for Schering-Plough for twenty-five years until his termination on October 30, 2002. He was never subject to any disciplinary action or negative employment evaluations. Nevertheless, shortly after objecting to "illegal Schering-Plough marketing practices in a company meeting" he was terminated from his employment. Aguerre also objected to the alleged illegal practices through the Schering-Plough hotline at its headquarters in New Jersey.
In January 2003, defendants Forton and Smart traveled from New Jersey to Buenos Aires to meet with Aguerre about his allegations of illegal practices. Aguerre voluntarily provided Forton and Smart with documents demonstrating the illegal conduct. After he received promises of "immunity" and no reprisals, Aguerre advised Forton and Smart that Archimbal and Caamaño also had information about the illegal conduct.
On February 6, 2003, Aguerre was terminated with a conciliation agreement[1] in which he alleged that he received substantially less money than he was entitled to under Argentinean law. Aguerre was represented by counsel of his own choosing in the proceeding before a Labor Conciliator. On February 12, 2003, the agreement was confirmed by the Ministry of Labor, Employment and Social Security and reduced to judgment.
Plaintiff Hector Hugo Caamaño worked for Essex for twenty-six years. Prior to his termination, he supervised the Marketing, Sales and Medical Departments. He was never subject to any disciplinary measures or adverse employment reviews.
On February 6 and 7, 2003, Caamaño claims that Hunter interrogated him about the illegal practices and encouraged him to speak freely, after which Hunter castigated him, stating:
His next precise words were "A UD SE LO COGIERON!" (YOU HAVE BEEN FUCKED). He said "You were instructed to proceed in a manner so that these things did not become public and you obviously failed. Everything you have just told me, could be told to *575 anybody. [Schering-Plough] cannot take the chance of being related to these kinds of practices. You should have played by the book and kept your mouth shut. Had this not become public, and if you did not come forward to corroborate these accusations, you would probably still have a job in the company. Unfortunately, you are going to have to start looking for another job and I recommend that it be outside the pharmaceutical industry."
On February 20, 2003, "Caamaño was summoned to a conference room . . . where he encountered [Daniel Rutilio] Zuccherino, Schering-Plough's General Counsel in Argentina; outside counsel for Schering-Plough; Mr. Del Vigo, Schering-Plough's Human Resources Officer, and a court reporter." Caamaño was then informed that he was being terminated:
Mr. Del Vigo said because of my intentions to denounce the Company's corrupt practices, I was not considered loyal to the company. He said that Schering-Plough would not hesitate to do the same to any other employee who spoke out against corrupt company practices.
Mr. Del Vigo explained that my termination could take two directions. If I decided to sign the mutual termination agreement, which was shown to me that moment, I would receive a check for severance pay plus an additional 30% once the executed agreement was formally approved by the labor court.
If I refused to sign the agreement, Mr. Del Vigo promised that Schering[-]Plough would make sure that I would never again work for a pharmaceutical company for the rest of my life. He said there was no point for me to even try taking legal action against Schering-Plough because I would have to pay large legal fees and would probably lose anyway. I replied that I still wanted to consult an attorney to make sure that it was in my best interest to sign the agreement.
Mr. Zuccherino then said that this was the only offer I would get and I had to decide whether or not to accept their "generous offer" then and there. Mr. Del Vigo told me to think of my family, of the possibility of unemployment and the length of a trial that could extend over a period of 4 years. He then gave me a pen and told me to sign before it was too late.
I though [sic] I had no real choice so I signed the agreement. Mr. Del Vigo then told me that Mr. Jorge Rovillard, Esq.  the person in the conference room I didn't know  would represent me in the labor court.

[Emphasis added.]
On March 24, 2003, Caamaño appeared before the National labor Court, represented by Rovillard, where the settlement agreement was memorialized in a judgment.
Hugo Archimbal worked for the Schering-Plough subsidiary for twenty-three years and was the Coordinator of Oncology Products before his termination. He was never subject to any disciplinary action or negative performance evaluations prior to his termination.
Archimbal's experience was similar to Caamaño's in that he first met with Hunter and was then called into a meeting at which Rovillard, the Schering-Plough attorney, was appointed to represent him. He was given a severance check with instructions to accept it in order to avoid delays. During the meeting, Archimbal was told
that Schering-Plough had decided to terminate my labor contract. While telling me this upsetting news he thrust *576 papers in front of my face  which I later found out were my so-called termination agreement and severance check.
I was so shocked I could barely get out my question: "Why are you doing this to me?" Mr. Del Vigo replied that I was being terminated because I had interfered with Schering-Plough's business by denouncing the company's marketing practices as corrupt. [He also told me] that "there was no room for that kind of behavior in Schering-Plough," and that any employee who contradicted the company's marketing policies and practices, for any reason, was a disloyal troublemaker and would suffer the consequences. Mr. Del Vigo said that I was a troublemaker and Schering-Plough wanted to "make an example" of me and other troublemakers as a warning to other employees.
Mr. Del Vigo told me that I had a choice: I could sign a "mutual termination agreement," which he then handed to me, in which case I would receive the prepared severance check and a promised additional 15% after the agreement had been approved by the labor court. Mr. [D]el Vigo said that if I didn't sign the agreement, I would still be fired from my job and Schering-Plough would do everything in its power to avoid paying me any severance at all, and would provide negative job references to make sure I would never get another job in the pharmaceutical industry.
I responded that I didn't understand the agreement and I wanted to consult with an attorney and think it over. Mr. Zuccherino then said that this "generous" offer was valid only if I signed it that moment, since the company wanted to resolve the problem as soon as possible.
Mr. Del Vigo said I should think of my family, of the possibility of unemployment and the length of a trial that could extend over a period of 4 years, or even longer if Schering[-]Plough appealed, which it would certainly do. He then handed me a pen and told me to sign before it was too late. . . .
I was also told that Mr. Jorge Rovillard, Esq., whom I had never before met, was to be "my attorney" before the relevant labor court.
I gave in to the pressure and signed the agreement. I didn't think I really had any other choice but to do so. In truth, I never really agreed to terminate my job at Schering-Plough. I was fired and forced to sign an agreement that falsely described my termination as by mutual agreement.
On March 11, 2003, Archimbal appeared before the National Labor Court with Rovillard as his counsel. Judgment was entered memorializing the settlement agreement.
Maria Cristina Fernandez worked for Essex for ten years. She was Vice-President and Co-Chair of the Board of Directors of the subsidiary "manag[ing] the Sales, Finance and Customer Service Departments, supervised twenty-one people, including the Medical Director, the Manager of Sales, fourteen Sales Coordinators and several Medical Assistants." Fernandez reported directly to the president of the subsidiary.
Fernandez alleges that she was terminated because she denounced "the illegal marketing and sales practices" of the subsidiary and "refused to go along with such practices." After her termination, Fernandez, represented by her own attorney, entered a settlement agreement pursuant to which "she received the amount of money mandated by Argentine law." The agreement was confirmed by the Ministry *577 of Labor, Employment and Social Security on October 11, 2002 and reduced to judgment.

II
On September 18, 2003, plaintiffs filed their initial complaint. Three amended complaints were subsequently filed. Before any discovery, defendants moved for summary judgment in lieu of answering the complaint.
The trial court granted defendants' motion on the grounds that (1) the Foreign Country Money-Judgments Recognition Act (FCMJRA or the Act), N.J.S.A. 2A:49A-16 to -24, precluded plaintiffs from bringing an action in the United States because each of their agreements were reduced to judgment in Argentina; (2) "the judgments entered in Argentina were final and conclusive;" and (3) the judgments "will be or would be enforceable under New Jersey law under . . . the Foreign Country Money[-]Judgment[s] Recognition Act unless they fall . . . within one of the exceptions." The court found that the judgments did not fall within any of the exceptions, articulated in N.J.S.A. 2A:49A-20.
Plaintiffs argued that their complaint falls within the public policy exception in N.J.S.A. 2A:49A-20b(3). The trial court found that, although New Jersey's public policy supports CEPA claims brought by mistreated whistleblowers, the issue is not relevant here because the pertinent question is whether the Argentine judgments are enforceable.
With respect to the defamation claims, the trial court found that:
[t]here's [sic] no allegations that defamatory statements were published in New Jersey or that the plaintiffs worked here or were attempting to get work here. This is a claim that really arises out of the impact of the conduct in Argentina. The defense argues that as a result of the circumstances that New Jersey . . . is an inconvenient forum and the case should be dismissed for that reason.
In their motion for reconsideration, plaintiffs argued that they "did not receive substantial consideration for waiving their rights against the defendant and[,] on [that] basis . . . Argentine res judicata law would not bar these claims." The court did not consider that ground an appropriate basis for reconsideration and denied the motion.
Plaintiffs appealed and argue here that the trial court erred in (1) recognizing the Argentine judgments and agreements under the FCMJRA; and (2) dismissing the defamation claims on the ground of forum non conveniens.

III
The FCMJRA provides parties who have previously litigated an issue with a tool for enforcing money judgments.[2] The Act provides that a foreign country's money judgment entitled to recognition will be enforceable in the same manner as the judgment of a sister state entitled to full faith and credit. N.J.S.A. 2A:49A-19. There are a number of statutory exceptions to the enforceability of a foreign country's money judgment. The Act is inapplicable if:
[a.] (1) the judgment was rendered under a system which does not provide *578 impartial tribunals or procedures compatible with the requirements of due process of law;
(2) the foreign country court did not have personal jurisdiction over the judgment debtor; or
(3) the foreign country court did not have jurisdiction over the subject matter.
b. A foreign country money-judgment need not be recognized if:
(1) the judgment debtor in the proceedings in the foreign country court did not receive notice of the proceedings in sufficient time to enable the judgment debtor to defend;
(2) the judgment was obtained by fraud;
(3) the cause of action on which the foreign judgment is based is contrary to the public policy of this State;
(4) the judgment conflicts with a prior final and conclusive judgment;
(5) the proceedings in the foreign country court were contrary to an agreement between the parties under which the dispute in question was to be settled, other than by proceedings in that court; or
(6) in the case of jurisdiction based only on personal service, the foreign country court was a seriously inconvenient forum for the trial of the action.
[N.J.S.A. 2A:49A-20.]
The focus of our review is b(3), commonly called the public policy exception.
As a threshold issue, we consider whether the FCMJRA, which is usually employed to enforce judgments, may be raised as an affirmative defense to preclude litigation of issues underlying the judgment. The Assembly Judiciary Committee report notes that the 1997 amendments changed the term "defendant" to "judgment debtor" in order "to be more comprehensive since there may be circumstances where the defendant in a matter is the successful judgment creditor." N.J.S.A. 2A:49A-16, L. 1997, c. 96. Implicit in this amendment is the notion that a successful judgment creditor can assert the Act as an affirmative defense. We conclude that the FCMJRA may, therefore, be pled as an affirmative defense.
In Sw. Livestock & Trucking Co. v. Ramon, 169 F.3d 317, 319 (5th Cir.1999), the defendant obtained a judgment against the plaintiffs in Mexico for the amount owed on a promissory note. While the suit in Mexico was being litigated, the plaintiffs filed suit in the United States District Court, "alleging that the loan arrangement violated Texas usury laws." Ibid. After the Mexican court entered its judgment in favor of the defendant, the plaintiffs filed a motion for summary judgment in the Federal District Court. Ibid. The defendant also moved for summary judgment, claiming that "the Mexican judgment barred [the plaintiffs'] suit" under the Texas Uniform Foreign Country Money-Judgment Recognition Act. Ibid. The District Court granted summary judgment in favor of the plaintiffs on the ground that the promissory note violated Texas public policy against usury. Ibid. The Fifth Circuit Court of Appeals reversed, however, finding that the defendant was entitled to recognition of the Mexican judgment. Id. at 322. The court specifically noted that different considerations apply when a party uses the Act as an affirmative defense:
The company is in a position different from that of a plaintiff who seeks to enforce a cause of action conferred by the laws of another state. The right which it claims should be given effect is set up by way of defense to an asserted liability; and to a defense different considerations apply. A state may, on occasion, decline to enforce a foreign cause *579 of action. In so doing, it merely denies a remedy leaving unimpaired the plaintiff's substantive right, so that he is free to enforce it elsewhere. But to refuse to give effect to a substantive defense under the applicable laws of another state, as under the circumstances here presented, subjects the defendant to irremediable liability. This may not be done.
[Ibid. (quoting Bradford Elec. Light Co. v. Clapper, 286 U.S. 145, 160, 52 S.Ct. 571, 576, 76 L.Ed. 1026 (1932) (finding that recognition of an agreement to abide by the terms of a sister state's act was required and permissible as an affirmative defense)). But see Van Kooten Holding B.V. v. Dumarco Corp., 1988 WL 6677, *2, 1988 U.S. Dist. LEXIS 613, *6 (N. D.Ill. January 22, 1988) (noting that counterclaims that could have been brought in the original action cannot be raised in a subsequent action to block the enforceability of the original judgment).]
Thus, the Fifth Circuit court concluded that the Mexican judgment was entitled to recognition despite the fact that the underlying cause of action violated Texas public policy. Sw. Livestock, supra, 169 F.3d at 323.
The Fifth Circuit's decision is not binding on us and is not persuasive on the issue of whether these foreign judgments violate New Jersey's public policy regarding whistleblowers. Plaintiffs argue that the judgments should not be recognized because they are based on retaliation against them in violation of CEPA. The trial court found that the underlying action was "a settlement of an employer/employee claim upon termination of that relationship," and that the public policy favoring negotiated settlements outweighed the policy underlying CEPA. The trial court stated:
Public policy in New Jersey favors negotiated settlement of disputes. It's permissible under New Jersey law for an employee and an employer upon termination of their relationship to reach a settlement, for the employee to relinquish claims against the employer in exchange for money. As a result, these judgments do not violate New Jersey public policy. Accordingly, this Court finds that the judgments in question are entitled to full faith and credit in New Jersey.
We disagree. While New Jersey does, indeed, favor negotiated settlements, Puder v. Buechel, 183 N.J. 428, 437-39, 874 A.2d 534 (2005), CEPA is the Legislature's expression of a strong public policy in that "[i]ts purpose is to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employees from engaging in such conduct." Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431, 650 A.2d 958 (1994).
The CEPA is remedial legislation and "should be construed liberally to effectuate its important social goal." Ibid. Moreover, the statute is a
"reaffirmation of [New Jersey's] repugnance to an employer's retaliation against an employee who has done nothing more than assert statutory rights and protections and a recognition by the Legislature of a preexisting common-law tort cause of action for such retaliatory discharge."
[Ibid. (quoting LePore v. Nat'l Tool & Mfg. Co., 115 N.J. 226, 228, 557 A.2d 1371 (1989)).]
In our view, the strong public policy underlying CEPA substantially outweighs the policy favoring settlements.
To establish a prima facie claim under CEPA, a plaintiff must show: *580
(1) a reasonable belief that the employer's conduct was violating either a law, rule, regulation or public policy;
(2) he or she performed a "whistle blowing" activity as described in N.J.S.A. 34:19-3(a) or (c);
(3) an adverse employment action was taken against him or her; and
(4) a causal connection existed between his whistle-blowing activity and the adverse employment action.
[Klein v. Univ. of Med. & Dentistry, 377 N.J.Super. 28, 38, 871 A.2d 681 (App. Div.), certif. denied, 185 N.J. 39, 878 A.2d 856 (2005) (citing Bowles v. City of Camden, 993 F.Supp. 255, 262 (D.N.J. 1998)); see also Dzwonar v. McDevitt, 177 N.J. 451, 462, 828 A.2d 893 (2003).]
Here, plaintiffs have alleged that defendants retaliated against them for their disclosures of Schering-Plough's illegal practices in Argentina and that the settlement agreements were coerced. Plaintiffs have pled the elements of a CEPA claim. As such, they fall within the public policy exception to the FCMJRA. N.J.S.A. 2A:49A-20b(3).

IV
Plaintiffs argue that the settlement agreements should be set aside because they were coerced. A settlement should always be entered into voluntarily. Peskin v. Peskin, 271 N.J.Super. 261, 275, 638 A.2d 849 (App.Div.), certif. denied, 137 N.J. 165, 644 A.2d 613 (1994) (finding that the defendant was coerced into entering a settlement agreement by the trial judge's tactics). A settlement achieved through coercion must be set aside. Jennings v. Reed, 381 N.J.Super. 217, 227, 885 A.2d 482 (2005) (quoting Pascarella v. Bruck, 190 N.J.Super. 118, 124-25, 462 A.2d 186 (App.Div.), certif. denied, 94 N.J. 600, 468 A.2d 233 (1983)); But see Minoia v. Kushner, 365 N.J.Super. 304, 312-13, 839 A.2d 90 (App.Div.), certif. denied, 180 N.J. 354, 851 A.2d 648 (2004) (holding that plaintiff was not coerced into entering a settlement agreement in an employment/partnership relationship, where plaintiff's terms were incorporated into the agreement and it provided a twenty day attorney review period).
Each of the agreements contains different release language. Aguerre, who was represented by counsel of his own choice, released only Essex. Fernandez, who was also represented by counsel of her choice, released Essex "or any company of the Schering-Plough S.A. Group," referring to the South American subsidiaries.
Archimbal and Caamaño were both represented by Schering-Plough's counsel. The language in their releases included Essex and all Schering-Plough entities. Thus, the all-inclusive release language lends weight to plaintiffs' claims that Archimbal and Caamaño, who were represented by Schering-Plough's counsel, were coerced to enter agreements containing the more comprehensive releases. Aguerre and Fernandez, who were represented by counsel of their choice, did not release Schering-Plough but claim that they were coerced to enter the agreements. If the agreements are set aside, however, the release language is irrelevant.
Having met the public policy exception to the FCMJRA, plaintiffs are entitled to pursue their claims that the agreements were coerced and to proceed with discovery on this issue, as well as their substantive CEPA claims. If plaintiffs are successful in having the agreements set aside, they may pursue their substantive CEPA claims against defendants.

V
The trial court dismissed plaintiffs' defamation claims on the ground of *581 forum non conveniens. In their complaint, each of the plaintiffs alleged that defamatory statements made by Schering-Plough damaged their reputations, preventing them from finding work in the pharmaceutical industry.
In dismissing the defamation claims, the trial court found that
[t]he defamation conduct took place in Argentina. Argentina is where the plaintiffs sought employment, where the . . . defamatory statements, if they were made, had an effect. There's no allegation [] that defamatory statements were published in New Jersey or that the plaintiffs worked here or were attempting to get work here. This is a claim that really arises out of the impact of conduct in Argentina. The defense argues that as a result of the circumstances that New Jersey is . . . an inconvenient forum . . . and the case should be dismissed for that reason.
The court noted further that "most if not all of the witnesses would be in Argentina" and a New Jersey court would have no power to compel Argentine witnesses to appear in New Jersey. Moreover, the significant expense of transporting people from Argentina to New Jersey, the time and expense of having all documents translated from Spanish to English and providing interpreters for the witnesses weigh in favor of the defamation claims being tried in Argentina where the conduct and the impact of the conduct occurred. On this issue we agree with the trial court.
"The doctrine of forum non conveniens, an equitable principle, is firmly embedded in the law of this State. Although phrased in a variety of ways, the essence of the doctrine is that a court may decline jurisdiction whenever the ends of justice indicate a trial in the forum selected by the plaintiff would be inappropriate." D'Agostino v. Johnson & Johnson, Inc., 225 N.J.Super. 250, 258-59, 542 A.2d 44 (1988), rev'd on other grounds, 133 N.J. 516, 628 A.2d 305 (1993) (citations omitted).
There are public and private interest factors to be considered in making a choice between forums. The private interest factors include practical matters, such as:
(1) the relative ease of access to sources of proof, (2) the availability of compulsory process for attendance of unwilling witnesses and the cost of obtaining the attendance of willing witnesses, (3) whether a view of the premises is appropriate to the action and (4) all other practical problems that make trial of the case "easy, expeditious and inexpensive," including the enforceability of the ultimate judgment.
[Id. at 263, 542 A.2d 44 (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055, 1062 (1947)).]
The public interest factors include:
(1) the administrative difficulties which follow from having litigation "pile up in congested centers" rather than being handled at its origin, (2) the imposition of jury duty on members of a community having no relation to the litigation, (3) the local interest in the subject matter such that affected members of the community may wish to view the trial and (4) the local interest "in having localized controversies decided at home."
[Ibid. (quoting Gulf Oil, supra, 330 U.S. at 508-09, 67 S.Ct. at 843, 91 L.Ed. at 1062-63).]
Plaintiffs minimize the private interest factors involving the practical aspects of litigating the defamation claims in New Jersey. They see no impediment in having witnesses travel to New Jersey or in having all of the documents translated or *582 interpreters provided in New Jersey. Commenting on the public interest factors, plaintiffs note that "Schering-Plough is one of the largest employers in one of the most important industries in New Jersey," and that "Schering-Plough has, in recent years, been the subject of public scrutiny at home and abroad for a variety of illegal activities that have resulted in, among other things, the imposition of hundreds of millions of dollars in fines and ouster of the president of the company." Plaintiffs maintain that defendants' defamatory conduct was in retaliation for plaintiffs having "blown the whistle" on "corrupt acts committed by or with the complicity and approval of the defendants from their Kenilworth[,] New Jersey, headquarters." Consequently, plaintiffs maintain that the defamation claims should be litigated in New Jersey. Defendants argue that "there is absolutely no New Jersey nexus to or interest in a localized defamation dispute having all of its roots in Argentina."
In weighing the public and private interest factors, we see no valid reason for retaining jurisdiction over the defamation claims. The alleged defamatory conduct and the consequences thereof occurred in Argentina. The witnesses, the documents and the cause of action are all particular to Argentina and we have no power to compel Argentine witnesses to appear in New Jersey. We, therefore, affirm the trial court's grant of summary judgment dismissing the defamation claims on the ground of forum non conveniens.

VI
To summarize our decision, we find that plaintiffs' CEPA claims, which underlie the Argentinean settlements and judgments, raise significant public policy issues in the context of corporate retaliation against whistleblowers employed by a foreign corporation with its roots in New Jersey. These issues warrant litigation of plaintiffs' claims in New Jersey under the public policy exception to the FCMJRA. N.J.S.A. 2A:49A-20b(3). Plaintiffs may proceed with discovery on the questions of (1) whether the settlement agreements were coerced; and (2) whether defendants violated the anti-retaliation provisions of CEPA. The trial court's dismissal of the defamation claims on the ground of forum non conveniens, however, is affirmed.
Affirmed in part; reversed and remanded in part.
NOTES
[1] The conciliation agreements are settlement agreements that were reduced to judgments in Argentina.
[2] A "foreign country money-judgment means any judgment of a foreign state granting or denying recovery of a sum of money, other than a judgment for taxes, a fine or other penalty, or a judgment for support in matrimonial or family matters." N.J.S.A. 2A:49A-17.