242 N.J. Super. 267 (1990)
576 A.2d 893
RICHARD J. D'AGOSTINO, PLAINTIFF-RESPONDENT,
v.
JOHNSON & JOHNSON, A NEW JERSEY CORPORATION, ROBERT N. WILSON AND RONALD G. GELBMAN, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 9, 1990.
Decided May 23, 1990.
*269 Before Judges KING and SHEBELL.
Alan E. Kraus argued the cause for appellants (Riker, Danzig, Scherer, Hyland & Perretti, attorneys; Alan E. Kraus, of counsel and on the supplemental letter brief; Laura J. Lokker and David P. Arciszewski, on the brief).
Douglas V. Rigler, admitted pro hac vice, argued the cause for respondent (Kaplan, Russin & Vecchi and Lasser, Hochman, Marcus, Guryan & Kuskin, attorneys; Douglas V. Rigler and Richard L. Zucker, on the brief and supplemental letter brief; Bruno A. Ristau, on the brief).
The opinion of the court was delivered by SHEBELL, J.A.D.
At issue in this interlocutory appeal is the propriety of a Law Division order requiring defendant corporation to produce certain officers and employees of its wholly-owned foreign subsidiaries for depositions in New Jersey. Plaintiff Richard J. D'Agostino's complaint against defendants Johnson & Johnson, a New Jersey corporation, Robert N. Wilson and Ronald F. Gelbman filed on December 4, 1986, in the Law Division claims that Johnson & Johnson (J & J) had caused its wholly-owned Swiss subsidiary, Cilag A.G., to wrongfully terminate his employment. It also alleges intentional injury to another, conspiracy, libel and slander.
The Law Division's grant of defendants' motion to dismiss the complaint on the basis of the doctrine of forum non conveniens was reversed in an earlier appeal. See D'Agostino *270 v. Johnson & Johnson, Inc., 225 N.J. Super. 250, 257, 542 A.2d 44 (App.Div. 1988), aff'd, 115 N.J. 491, 559 A.2d 420 (1989). After examining the relevant factors, we concluded that while Switzerland provided an adequate forum, because plaintiff asserted that many occurrences pertinent to the law suit happened here, New Jersey was an equally appropriate forum. Id. at 262-67, 542 A.2d 44. Our Supreme Court affirmed this court's decision, and the matter was remanded to the Law Division. 115 N.J. 491, 559 A.2d 420.
In November 1989, plaintiff gave notice to take oral depositions of 16 individuals, including officers of J & J's foreign subsidiaries, but did not subpoena the proposed witnesses. J & J refused to present several of the proposed witnesses for depositions, including officers of its wholly-owned foreign subsidiaries. J & J asserted that plaintiff did not have the right to require the presence at depositions of individuals who were officers of foreign subsidiaries because these subsidiaries were separate legal entities, the individuals were unrelated to the case, beyond the subpoena power of New Jersey courts and were prohibited from participating in depositions under Swiss law.
Due in part to defendants' failure to produce the requested witnesses for depositions on December 1, 1989, plaintiff moved to compel discovery and requested the imposition of sanctions. Argument was heard on January 5, 1990, after which the judge delivered a decision in favor of plaintiff from the bench. On January 31, 1990, a discovery order was entered and a letter opinion issued providing in pertinent part: "Defendants shall produce those corporate witnesses to testify in accord with the Notice of Deposition of November 13, 1989, provided they are officers, directors, or managing agents of defendant corporation or its subsidiaries." We granted leave to appeal from portions of the January 31, 1990, order which required officers of J & J's subsidiaries to attend depositions in New Jersey.
*271 The underlying facts of this case were detailed in our earlier opinion regarding defendants' motion to dismiss on the basis of forum non conveniens. See 225 N.J. Super. at 253-57, 542 A.2d 44. Therefore, we only briefly recount the facts. As we noted at the time of our earlier opinion, "[t]he factual background of this litigation is hotly contested." Id. at 253, 542 A.2d 44.
On December 21, 1984, plaintiff entered into an employment contract with J & J's wholly-owned subsidiary, Cilag A.G. (Cilag). Cilag manufactures and markets pharmaceuticals in Switzerland. Through its affiliates, Cilag International and Cilag Products, it also markets products in other countries in Europe. Plaintiff was hired as General Manager of Cilag's home market division. Among other duties, plaintiff was responsible for registration and approval of new pharmaceutical products. Plaintiff allegedly reported to "Paul Reinstadtler, the managing director of Cilag Gmbh, a German subsidiary of Johnson & Johnson, and Hans S. Schmid, Vice President of J & J International as well as President and Chairman of the Board of Cilag, A.G. and Vice President of Cilag International A.G."
Shortly after being hired by Cilag, plaintiff became aware of J & J's strong desire to gain Swiss approval of Imunox, a synthetic hormone marketed elsewhere in Europe by J & J. In his complaint, plaintiff recounted a meeting that took place on June 8, 1985, at J & J headquarters in New Brunswick, New Jersey, between himself and several officials of J & J and its subsidiaries. These officials included defendant Robert N. Wilson. Plaintiff alleged that Wilson was "Vice Chairman of the J & J Executive Committee and Chairman of the Pharmaceutical Sector and [was] Executive Vice President of Johnson & Johnson International." Plaintiff further claimed that Mr. Wilson was responsible for pharmaceutical registration and marketing policies for "J & J International's overseas subsidiaries...." Defendants denied this allegation and maintained that Mr. Wilson was only Chairman of J & J's Pharmaceutical Diagnostics Section. According to plaintiff's complaint, the coordinator *272 of J & J's European effort to obtain approval of Imunox reported directly to Mr. Wilson at J & J headquarters in New Jersey.
Plaintiff was fired on July 24, 1985. He alleges his dismissal was related to his refusal to approve certain consulting fees which he deemed suspect, and which he inferred might be related to improperly expediting approval of Imunox. Defendants assert that plaintiff's dismissal was caused by a variety of problems, including "a certain lack of cooperation, an inattention to company objectives ... and a basic failure to perform the sales and managerial responsibilities which we had expected of him."
After being advised of plaintiff's intention to sue for wrongful termination based on his refusal to authorize the payments, Cilag commenced legal actions against plaintiff in a Swiss court. Cilag sought "a declaratory judgment that plaintiff had no claims against Cilag arising from his employment or its termination, and an injunction prohibiting plaintiff from disclosing confidential Cilag documents to third parties." We were advised at oral argument on this appeal that the Swiss court dismissed the action on its own motion for failure to raise a justiciable issue.
Defendants argue that paragraph one of the Law Division's discovery order requiring defendants to produce for depositions corporate witnesses that are "officers, directors, or managing agents of defendant corporation or its subsidiaries[]" is improper as "[t]here is no legal basis for compelling deposition discovery from non-party subsidiaries of Johnson & Johnson as if they were parties." In addition, defendants maintain that the court's reliance on cases pertaining to discovery of documents from a parent company's subsidiary pursuant to R. 4:18-1 is inappropriate because the discovery rule pertinent to document discovery focuses on "control," while the rules relevant to depositions do not. Compare R. 4:14-1, 4:14-2 with R. 4:18-1.
*273 R. 4:14-1 provides that "after commencement of the action, any party may take the testimony of any person, including a party, by deposition upon oral examination.... The attendance of witnesses may be compelled by subpoena as provided in R. 4:14-7." R. 4:14-2 sets forth the requirements for notices of depositions, including those to corporate entities. R. 4:14-2(c). While it is true that the rule pertinent to document discovery is not directly applicable, the defendants are incorrect in their assertion that the issue of "control" is not relevant to whether they must produce subsidiary executives for depositions. See Pressler, Current N.J. Court Rules, Comment R. 4:14-2(c); Sykes Intern., Limited v. Pilch's Poultry Breeding Farms, Inc., 55 F.R.D. 138, 139 (D.Conn. 1972). Although the rules do not specifically state that a proposed corporate deponent must be under the control of the corporate party in order to require the deponent's presence, such control must exist before a party can be compelled to produce a deponent. See Sykes Intern., Limited, 55 F.R.D. at 139. Therefore, the factor of control by a corporate party over its officers, directors and managing agents is implicit within the rule. See R. 4:14-2(c).
The rules pertaining to subpoenas are set forth in R. 4:14-7 and contain provisions relevant to taking depositions of non-residents. R. 4:14-7(b). These include reasonable time and place requirements. R. 4:14-7(b). The rules pertaining to notices of depositions and compelling discovery are modeled after the Federal Rules of Civil Procedure and are substantially the same. See Pressler, Current N.J. Court Rules, Comment R. 4:14-1, 4:14-2 and 4:23-1 (1990).
The trial court in granting plaintiff relief relied heavily on cases and other authorities that stood for the principle that a parent corporation has an obligation to produce documents that are within its control. See, e.g., R. 4:18-1; Gross v. Kennedy, 15 N.J. Super. 118, 83 A.2d 58 (Law Div. 1951); Schnitzer & Wildstein, N.J. Rules Serv. 1954 to 1967, at A IV-702, § 4:24-1; Moore's Federal Practice, ¶ 30.51 at 30-45 to 30-48. In its decision from the bench the court quoted extensively *274 from Gross, 15 N.J. Super. at 121-23, 83 A.2d 58. There, the Law Division held that a corporation that was in control of a subsidiary's records had a duty to produce them during discovery. Ibid. It is, of course, recognized that production of documents is not governed by the same rules as those for depositions. (Compare R. 4:18-1 et seq. with R. 4:14-1).
The trial court also quoted the following language from Moore's Federal Practice, ¶ 30.51 at 30-45 to 30-46, to support its conclusion that a parent corporation should produce officers of subsidiaries within its control:
A corporation may not be examined through its former officers, directors or managing agents, nor through its subordinate employees or its stockholders. But when a former officer, director or managing agent presently holds a similar position in a wholly-owned subsidiary of deponent, it has been held such person has maintained an identity of interest with, and is still subject to the control of deponent for the purpose of compelling his attendance by notice. [Ibid. (footnotes omitted)].
This language from Moore's pertains to former company officials who currently hold similar positions with wholly-owned subsidiaries, rather than officers of subsidiaries who have never been executives of a parent corporation. While perhaps not directly on point, it is closely analogous. See Moore's Federal Practice, ¶ 30.51 at 30-45 to 30-46.
Four of the five subsidiary executives are residents of Switzerland. Therefore, other considerations are implicated in the discovery order under review. According to defendants, Swiss law does not allow for private parties to take depositions. Further, the Swiss government is not a signatory to the Hague Convention Treaty on Taking Evidence Abroad in Civil or Commercial Matters. See generally Societe Nat. Ind. Aero v. U.S. Dist. Court, 482 U.S. 522, 533-43, 107 S.Ct. 2542, 2550-55, 96 L.Ed.2d 461, 477-83 (1987) (explaining background and operation of Hague Convention).
The trial court made no factual findings with respect to whether the subsidiary corporations or executives required for depositions were within the control of defendant J & J. However, appellants do not deny control for purposes of this appeal. *275 In addition, Cilag is a wholly-owned subsidiary of J & J and clearly under its control. See Environmental Tectonics v. W.S. Kirkpatrick & Co., 659 F. Supp. 1381, 1388 (D.N.J. 1987), aff'd. in part and rev'd in part, 847 F.2d 1052 (3d Cir.1988), ___ U.S. ___, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) (factors relating to control); see also State, Dept. of Environ. Protect. v. Ventron Corp., 94 N.J. 473, 500-01, 468 A.2d 150 (1983); Allied Corp. v. Frola, 701 F. Supp. 1084, 1089 (D.N.J. 1988).
Thus, defendants' contention that the noticed subsidiary executives are non-parties and that their attendance at depositions could only be mandated by subpoena is without merit. The use of a subpoena is "merely intended to assure that the non-party whose testimony is sought submits to examination. There is no necessity for requiring service of a subpoena upon a party since adequate sanctions are provided ... in the event that the party fails to respond to a notice to take a deposition." Less v. Taber Instrument Corp., 53 F.R.D. 645, 647 (W.D.N.Y. 1971).
Further, one of the proposed deponents offered a certification in favor of defendants at the outset of the case. Thus, he has already participated in the proceedings. In its 10-K filing with the Securities and Exchange Commission and in its Annual Report to Stockholders, J & J stated:
The international business of Johnson & Johnson is conducted by subsidiaries manufacturing in 53 countries outside the United States and selling in most countries of the world. Wherever feasible, Johnson & Johnson's practice has been to establish manufacturing units overseas to service the local markets.
J & J described its corporate organization in its 1988 Annual Report as follows:
The company is organized on the principles of decentralized management. The Executive Committee of Johnson & Johnson is the principal management group responsible for the operations of the Company. In addition, three Executive Committee members are Chairmen of Sector Operating Committees, which comprise managers who represent key operations within the sector, as well as management expertise in other specialized functions. Those Committees oversee and coordinate the activities of domestic and international companies related to each of the consumer, pharmaceutical, professional and diagnostic business. Operating management of each company is headed by a President, General Manager or Managing Director who reports directly or through a Company Group Chairman.
*276 Plaintiff also has referred us to an intercompany memorandum from proposed deponent Paul Reinstadtler which states, "[t]he monthly net sales, income and commentary reports for J & J, New Brunswick, from Switzerland and Austria will be sent to Mr. Vogl (latest one day before due in New Brunswick) who will pass them on  together with the German report  to J & J, New Brunswick." Plaintiff also cites a confidential position paper that outlines the interrelationship of J & J top management and subsidiaries.
We conclude that the trial court acted properly in entering an order to compel the depositions of J & J's subsidiaries' officers, directors, or managing agents. See Moore's Federal Practice, ¶ 30.55[1] at 30-73; see also Sykes Intern., Limited, 55 F.R.D. at 139; Less, 53 F.R.D. at 647. We are satisfied from the record presented that there is a sufficiently close relationship between J & J and its wholly-owned subsidiaries to require it to produce the requested foreign-based executives. There is a common identity between officers of J & J's various subsidiaries (e.g., J & J International, Cilag, Gmbh, and Cilag, A.G.) and itself. See Environmental Tectonics, 659 F. Supp. at 1388. It is undisputed that J & J owns all the stock of the subsidiary corporations whose executives are subject to depositions. Ibid.; cf. State, Dept. of Environ. Protect., 94 N.J. at 155, 468 A.2d 150. The subsidiaries apparently share in financial arrangements and report back to J & J headquarters in New Jersey. The requisite element of control is beyond dispute.
Defendants argue that even if the legal authority existed the trial court abused its discretion by ordering the production for depositions in New Jersey of foreign-based executives of J & J's wholly-owned subsidiaries. R. 4:14-2(a) provides that a notice of depositions "shall state the time and place for taking the deposition, which shall be reasonably convenient for all parties...." Defendants refer us to the time and place requirements in R. 4:14-7(b) which apply to witnesses required to attend depositions under subpoena. The persons to be deposed *277 under the order are not to be subpoenaed, thus the court was in a position to consider the factors related to convenience. R. 4:23-1; R. 4:14-2(a).
Defendants rely on the proposition "that `[t]he deposition of a corporation by its agents and officers should ordinarily be taken at its principal place of business....'" Salter v. Upjohn Co., 593 F.2d 649, 651 (5th Cir.1979), quoting 8 C. Wright & A. Miller, Federal Practice & Procedure § 212 at 410 (1970); see also Work v. Bier, 107 F.R.D. 789, 792 n. 4 (D.D.C. 1985). It is recognized, however, that this rule may be modified. See Salter, 593 F.2d at 652; Work, 107 F.R.D. at 792, n. 4. When peculiar circumstances exist that warrant the taking of depositions outside the jurisdiction where the deponent resides, or at a location other than the corporation's principal place of business, then a court may order depositions be taken elsewhere. See Salter, 593 F.2d at 651-52. These peculiar circumstances should not be limited to the relative financial burdens of the parties to the litigation. See Work, 107 F.R.D. at 792, n. 4.
Here, plaintiff is unable to take depositions in Switzerland where several of the witnesses are located. All of the foreign-based executives of J & J's subsidiaries are within J & J's control. We do not perceive that requiring them to come to New Jersey where J & J has its corporate headquarters is an excessive burden. See Salter, 593 F.2d at 651; Sykes Intern., Limited, 55 F.R.D. at 139; Tietz v. Textron, Inc., 94 F.R.D. 638, 639-40 (E.D.Wis. 1982). Indeed defendants concede that one or more of the deponents are expected to appear voluntarily in New Jersey as trial witnesses, and that when business requires foreign executives are summoned to New Jersey. Nonetheless, defendants assert that taking depositions in New Jersey would result in a substantial disruption of the proposed deponents' lives and work, as well as impose an excessive financial burden on J & J. This argument ignores the practicality of the situation, and seeks to deny plaintiff the opportunity to take depositions.
*278 Defendants rely on Buryan v. Max Factor & Co., 41 F.R.D. 330 (S.D.N.Y. 1967), where a federal judge refused to order corporate officers to come from California to New York for depositions. 41 F.R.D. at 331-32. In Buryan, the court found that "[t]he five officers sought to be examined constitute[d] the top management of the defendant ... being its Chairman of the Board, Vice-Chairman of the Board, President, Executive Vice-President and its Secretary-General Counsel...." Id. at 331. The court determined that besides the expense and annoyance of coming to New York for depositions, their absence would cause severe problems "since they [were] required at [the defendant's] main office for day-to-day decisions of the type demanded of executives in their position." Id. at 331-32. Thus, the court concluded that depositions should be conducted in California, and considering the parties' financial positions, at the plaintiff's expense. Id. at 332.
While plaintiff seeks to depose upper echelon executives, he does not wish to examine all the executives of a single company as was the case in Buryan. There is no indication that J & J's foreign subsidiaries could not continue to function normally during the absence of the executives. The mere fact that a person requested for deposition is a busy executive is not enough to bar that person's examination. See Less, 53 F.R.D. at 647. The impossibility of deposing people where they lived and worked did not exist in Buryan as it does here.
One last issue exists  that of who should bear the expense of producing the witnesses at the depositions. The respective economic positions of the parties to the litigation and the size of the amount of damages sought by plaintiff are relevant on the issue of the burden of the expense for bringing the requisite deponents to New Jersey. See Work, 107 F.R.D. at 792, n. 4; Sykes Intern., Limited, 55 F.R.D. at 139; Buryan, 41 F.R.D. at 332. Here, although the trial judge did not make specific findings regarding the parties' respective economic positions, it seems beyond dispute that J & J is in a more *279 favorable economic position than plaintiff. We find no basis for reversal on the grounds of undue financial burden, and find no other factors which should cause reversal of the motion judge's order placing the expense on defendants.
Defendants argue that since there is no procedure for taking private depositions in Switzerland, they will be prejudiced if depositions are taken in New Jersey because plaintiff will be able to obtain information he would have otherwise been precluded from obtaining in Switzerland. Although defendants may lose the advantage of the Swiss law, this does not result in unfair prejudice. Defendants are merely being made subject to the same discovery procedures as all other litigants in New Jersey.
Defendants suggest that by requiring the Swiss-based executives to testify at depositions in New Jersey, these executives may be placed in the position of disclosing information in violation of Switzerland's economic espionage law. Article 273 of the Swiss Penal Code provides:
Whoever explores a manufacturing or business secret in order to make it accessible to a foreign authority or foreign organization or a foreign private business enterprise or their agents;
whoever makes a manufacturing or business secret accessible to a foreign authority or a foreign organization or a foreign private enterprise or their agents,
shall be punished with imprisonment, in serious cases with penitentiary confinement. The deprivement of liberty can be combined with a fine.
It is the Swiss-based executives who must personally assert their right not to incriminate themselves. 23 Am.Jur.2d, Depositions and Discovery § 38 at 373 (1983). Defendants' expert on Swiss law concludes that there is only a possibility that discovery of information pertaining to Cilag would violate Swiss law. We view this possibility as remote. There appears to be no Swiss public interest in keeping information relevant to plaintiff's claims secret. These interests are primarily of private concern to the prospective deponents and the defendant. Plaintiff has noted that defendant J & J has in the past *280 voluntarily disclosed business information regarding its Swiss-based subsidiary which relates to the claims in this case.
It is impossible to determine at this time whether the prospective deponents' testimony would in any way violate Swiss law. It would be unfair to the plaintiff to allow defendants to have unbridled discretion in selecting what information to disclose. In addition, it would be inappropriate and perhaps futile to try to determine on the basis of the Swiss law currently before the court whether the Swiss-based witnesses would in fact violate Swiss law by giving deposition testimony here in New Jersey. See State of Ohio v. Arthur Andersen & Co., 570 F.2d 1370, 1374 (10th Cir.), cert. den., 439 U.S. 833, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978). The situation presented here is similar to an instance where a witness is asked to disclose a trade secret. See Moore's Federal Practice, ¶ 26.75 at 26-485.
Where the court is satisfied in a particular case that the need for discovery is not greater than the desirability of the maintenance of the secrecy of certain processes, developments, or research, it may make an order that such secret processes, developments, or research need not be disclosed. [Id. at ¶ 26.75 at 26-485 to 26-486; footnote omitted].
Pursuant to R. 4:10-3, a witness may move for a protective order in the trial court. In Societe Internationale v. Rogers, 357 U.S. 197, 206, 78 S.Ct. 1087, 1092, 2 L.Ed.2d 1255, 1263 (1958), the United States Supreme Court stated in a similar situation involving production of documents that might violate Swiss secrecy law, that discovery rules are "sufficiently flexible to be adapted to exigencies of particular litigation." More recently the Supreme Court has stated, "American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary or unduly burdensome discovery may place them in a disadvantageous position." Societe Nat. Ind. Aero., 482 U.S. at 546, 107 S.Ct. at 2557, 96 L.Ed.2d at 485. If it appears that a protective order that permits the Swiss-based witnesses to object to answering specific questions may be appropriate, we trust that an application will be made.
*281 Under R. 4:10-3, the burden is clearly on the person to be deposed to show that a protective order is necessary as to specific questions they object to on the ground that if answered they would subject themselves to jeopardy under Swiss law. See Arthur Andersen & Co., 570 F.2d at 1374; Wachs v. Winter, 569 F. Supp. 1438, 1442-43 (E.D.N.Y. 1983); see generally 23 Am.Jur.2d, Depositions and Discovery § 38 (1983). We stress that "objections must be made to specific questions ..." and a court must determine if the objections are valid. 23 Am.Jur.2d, Depositions and Discovery § 38 at 373; see also Arthur Andersen & Co., 570 F.2d at 1374.
Affirmed.