**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1290-22

DENISE C. WILLSON,

    Plaintiff-Respondent.

v.

GERBER PRODUCTS
COMPANY, NESTLÉ
HEATHCARE NUTRITION,
INC., d/b/a NESTLÉ HEALTH
SCIENCE, NESTLÉ
HOLDINGS, INC., and
WILLIAM PARTYKA,

    Defendants-Appellants.

_____

        Argued October 17, 2023 – Decided December 26, 2023

        Before Judges Gooden Brown and Puglisi.

        On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-5095-19.

        Domenick Carmagnola argued the cause for appellants (Carmagnola & Ritardi, LLC, attorneys; Domenick Carmagnola, of counsel; Gina Casale and Stephanie Torres, on the briefs).

Nancy Erika Smith argued the cause for respondent (Smith Mullin, PC, attorneys; Nancy Erika Smith and Virginia A. Pallotto, of counsel and on the briefs).

PER CURIAM

This appeal from an interlocutory order involves a discovery dispute in an employment discrimination case. Plaintiff Denise Willson sued defendants Gerber Products Company (Gerber), Nestlé Healthcare Nutrition, Inc., doing business as Nestlé Health Science (Nestlé Health), Nestlé Holdings, Inc. (Nestlé Holdings), and William Partyka, the President and CEO of Gerber and plaintiff's former direct supervisor, alleging age and gender discrimination as well as unequal pay and retaliatory termination in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. In the complaint, plaintiff alleged she met with Partyka's supervisor, Alexandre Costa, and informed him of defendants' retaliatory termination, sex discrimination, and failure to promote her. Although defendants do not dispute that the meeting occurred, they deny plaintiff's allegations about the content of the meeting.

Costa resides in Switzerland.[1] Plaintiff sought to conduct an in-person deposition of Costa in New Jersey. Defendants objected on the grounds that

_____

[1] During oral argument, we were informed that Costa is not a citizen of Switzerland as indicated in defendants' merits brief.

Costa had limited knowledge of the matter, neither he nor his employer, Nestlé Enterprises S.A. (Nestlé Enterprises), was a party to the case, and none of the named defendants was a parent or direct subsidiary of Costa's employer. Further, defendants argued that because Costa was a Swiss resident, any deposition must comply with Swiss law and the Hague Convention,[2] of which both the United States and Switzerland were signatories.

On November 18, 2022, the trial judge issued an order compelling defendants to produce Costa for deposition in New Jersey at defendants' expense. By leave granted, defendants now appeal the November 18 order, raising the following arguments for our consideration:

> THE TRIAL COURT ERRED IN ORDERING THAT DEFENDANTS ARE REQUIRED TO PRODUCE MR. COSTA FOR HIS DEPOSITION TESTIMONY IN NEW JERSEY.
>
> A. Given Switzerland's Status as a Signatory to The Hague Convention, the Trial Court's November 18, 2022 Order Is Improper and Contrary to New Jersey Law.
>
> B. The Trial Court's November 18, 2022 Order Is Erroneous as it is Founded on Inapt Caselaw.

---

[2] Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, opened for signature Mar. 18, 1970, 23 U.S.T. 2555, 847 U.N.T.S. 231 (hereinafter Hague Convention).

A-1290-22

C. As Defendants Hold No Control Over Mr. Costa, The Trial Court Erred in Ordering that Defendants are Required to Produce Mr. Costa for His Deposition Testimony in New Jersey.

We affirm.

I.

Plaintiff was employed by Gerber, a seller of infant and toddler nutrition products, from 1994 until she was terminated on January 30, 2019, effective March 29, 2019. Prior to her termination, her position was "Vice President, Medical Sales North America for Nestlé Infant Nutrition-North America," and she worked out of the Florham Park, New Jersey, office. In her ensuing July 12, 2019, discrimination complaint, plaintiff alleged that her supervisor, defendant Partyka, "fostered and promoted a male 'boys club' culture" by, among other things, hosting "male-only employee poker games" and "male employee golf outings," "promoting and rewarding male employees over female employees," and "paying senior level male employees more than their female counterparts." Plaintiff further alleged that when she was sixty-three years of age, Partyka refused to consider her for a promotion to a newly created general manager position for which she was qualified, giving the position instead to a less qualified "younger male" employee.

A-1290-22

Plaintiff asserted she was terminated in retaliation for her complaints about discrimination to "upper managers," and that upper-level managers were aware of the hostile work environment, including "Alex Costa, Regional Business Head Zone AMS, who [was] in charge of Gerber and Nestlé's operations in North America" and South America and to whom "Partyka report[ed]." According to the complaint, in a March 5, 2019, meeting with Costa, "plaintiff complained about her retaliatory termination, the sex discrimination, and failure to promote her."

In the complaint, plaintiff specifically asserted the following causes of action:

> (1) Gender and Age Discrimination in Failing to Promote in Violation of the LAD Against All Corporate Defendants;
>
> (2) LAD Wrongful Termination and Retaliation Against All Corporate Defendants;
>
> (3) Hostile Work Environment Against All Corporate Defendants;
>
> (4) Unequal Pay Claims Under New Jersey Law Against All Defendants; and
>
> (5) Aiding and Abetting under the LAD against Partyka, Nestlé Health, and Nestlé Holdings.

5

Neither Costa nor his employer, Nestlé Enterprises, were named defendants in the complaint. The only corporate defendants named in the complaint were Gerber, Nestlé Health, and Nestlé Holdings. Gerber "is a wholly owned subsidiary of . . . Nestlé Holdings." Gerber was incorporated in Michigan and headquartered in Florham Park, New Jersey, from approximately 2007 until 2019, when its corporate headquarters relocated to Arlington, Virginia. Nestlé Health is also a wholly owned subsidiary of Nestlé Holdings. Nestlé Holdings is a wholly owned subsidiary of NIMCO US, Inc., which is an indirect wholly owned subsidiary of Nestlé S.A. Nestlé Enterprises is a wholly owned subsidiary of Société des Produits Nestlé S.A. Nestlé S.A. is the "holding company of the Nestlé group of companies" and is incorporated in Switzerland.

The parties engaged in extensive motion practice to compel depositions of various individuals, including top level corporate executives. Pertinent to this appeal, after plaintiff served deposition notices for Costa's deposition, defendants moved to quash the deposition notices and for a protective order. In support, defendants submitted an October 8, 2020, certification prepared by Costa in which he averred that he had no "specific knowledge about [plaintiff's] allegations or the matters contained in [plaintiff's complaint]."

Costa certified that he was "the Senior Vice President and Head of Nestle Infant Nutrition Zone Americas" at Nestlé Enterprises, and was responsible for "lead[ing] and develop[ing] the Business Managers to ensure employee engagement and deliver[y of] business objectives." He attested that he had "limited interaction with [p]laintiff" as she was not one of his "direct report[s]." Nonetheless, Costa confirmed meeting with plaintiff on March 5, 2019, but stated the meeting was for the specific purposes of discussing "the progress" of "the [m]edical and [i]nfant [f]ormula sales force" that plaintiff led.

Costa denied having "any discussion" with plaintiff about "retaliatory conduct, sex discrimination, or failure to promote." However, he affirmed that during the meeting, plaintiff made a vague reference to her termination, to which Costa responded that he was "not responsible for any decisions taken related to her employment, and that [he] was not in a position to discuss that decision with her." According to Costa, "[t]here was no further discussion related to her termination and there were no comments or references to any complaints about her employment made by [plaintiff]." Costa asserted that "forc[ing him] to sit for a deposition . . . [would] unnecessarily interfere with [his] employment" and "create a tremendous burden on [his] business."

7

Following oral argument, on November 18, 2020, the judge entered an order granting in part, and denying in part, defendants' motion. Based on the record presented, the judge found that

> [p]laintiff is entitled at this time to discovery of [Costa's] testimony concerning the meeting he had with . . . [p]laintiff that is asserted in the [c]omplaint and acknowledged by the witness and any other interactions with . . . [p]laintiff or other individuals, including [d]efendant Partyka, concerning . . . [p]laintiff.

However, the judge imposed limits on deposing Costa, prohibiting plaintiff from "inquir[ing] into other matters such as corporate policies and procedures" because she "must first seek such information from other sources before deposing a high ranking corporate executive." Additionally, acknowledging the restrictions imposed by the Covid-19 pandemic, the judge required that Costa's deposition "be remote in the present circumstances" and that "[a]ny remote deposition of . . . Costa in Switzerland . . . comply with all applicable laws for the taking of such testimony."

Thereafter, plaintiff sent defendants notices to take a videotaped deposition of Costa. Defendants responded with a request for "proof of compliance with all applicable Swiss laws for the taking of such testimony." When the parties could not agree on the terms for Costa's deposition, plaintiff

sought reconsideration of the November 18, 2020, order, this time seeking to compel Costa to appear in New Jersey for an in-person deposition. In opposition, defendants submitted a second certification prepared by Costa on September 1, 2022. In the second certification, Costa stressed that he had never been "an employee, officer, or director" of any of the named corporate defendants and "[n]one of the named [corporate d]efendants [was] a parent or direct subsidiary of [his] employer" and therefore "[could] not direct [him] . . . to appear for a deposition." Although he was responsible for business operations in several regions, including Central America, he also certified that he had no "planned business trips to the United States" during the year and he "[had] never agreed to waive [his] rights under Swiss law or otherwise."[3]

Following oral argument, the judge entered a November 18, 2022, order granting plaintiff's application to compel Costa's deposition in New Jersey and ordering defendants to produce Costa in New Jersey at defendants' expense. In his accompanying statement of reasons, the judge reiterated that he "previously determined that Mr. Costa may possess information relevant to the claims or defenses in this case. . . . [so] there is no issue as to [p]laintiff's right to obtain

---

[3] Plaintiff introduced a third certification prepared by Costa on March 2, 2022, from an unrelated case naming Gerber and Nestlé S.A as defendants. That certification was executed in Mexico.

such testimony." Further, according to the judge, "[d]efendants' counsel acknowledged that, although he did not plan to call Mr. Costa as a witness, it is conceivable he might do so depending on . . . [p]laintiff's evidence concerning her interactions with Mr. Costa." After considering the record as a whole, the judge found "no showing . . . that requiring a single executive of a large organization to appear for a deposition would be unduly burdensome or would interfere with the operation of his direct employer or the enterprise as a whole."

Acknowledging Costa's rights as a Swiss resident as well as "the requirements of the Hague Convention, to which Switzerland had now acceded," the judge reasoned that an order "requiring . . . [d]efendants to produce Mr. Costa is not directed to Mr. Costa," but to defendants, "entities that are subject to the [c]ourt's jurisdiction and that are required to respond to . . . [p]laintiff's legitimate discovery demands." The judge pointed out that although

> the Hague Convention and Swiss law govern the taking of discovery, whether in person or via electronic means, in Switzerland[,] . . . [t]here is no bar under such instrument or law requiring . . . [d]efendants . . . to produce Mr. Costa for a deposition in New Jersey.

The judge clarified that his previous order for Costa's remote deposition in Switzerland, which would undoubtedly have been "subject[ed] to the Hague Convention and Swiss law," was due to the "international travel restrictions"

existing in 2020 that prevented defendants from producing Costa for an in-person deposition in New Jersey.

In compelling Costa's production, the judge relied on D'Agostino v. Johnson & Johnson, 242 N.J. Super. 267 (App. Div. 1990), which he found "both binding and instructive." The judge explained:

> There, the New Jersey Appellate Division held the plaintiff was entitled to compel the depositions in New Jersey of various executives who were employees of subsidiaries of the defendant Johnson & Johnson and who were located in Switzerland.
>
> In D'Agostino, the court reasoned that it was reasonable for the parties to notice the depositions through Johnson & Johnson, as the latter was in a position to control the appearance of witnesses employed by its subsidiaries. Likewise, although . . . [d]efendants are not corporate parents of the entity for which Mr. Costa works, they are at minimum affiliated sister corporations. Moreover, they possessed sufficient control over Mr. Costa to secure a [c]ertification from him in this action. The D'Agostino court determined, as to one of the deponents at issue, that the submission by such individual of a certification was an indicator of Johnson & Johnson's control over the witness.

The judge rejected defendants' attempt to distinguish D'Agostino, stating:

> Defendants contend that, when the Appellate Division decided D'Agostino, Switzerland was not a party to the Hague Convention, and the plaintiff there could not have obtained the sought for evidence in Switzerland. They posit that Switzerland has since acceded to the

convention and a process now exists to secure evidence from Mr. Costa in Switzerland. They suggest that, as a result, D'Agostino is no longer good law.

This [c]ourt disagrees. The process for securing Mr. Costa's testimony in Switzerland via the [Hague] [C]onvention or Swiss law is still cumbersome, expensive, and time consuming. In any event, the principal issue in D'Agostino was control over the witnesses, and here, as in D'Agostino, the record establishes sufficient control.

The judge ordered the parties to "reasonably cooperate" to schedule Costa's deposition when "[he] is travelling to North or South America," and this appeal followed.

II.

"We generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or its determination is based on a mistaken understanding of the applicable law." Rivers v. LSC P'ship, 378 N.J. Super. 68, 80 (App. Div. 2005) (citing Payton v. N.J. Tpk. Auth., 148 N.J. 524, 559 (1997)). An abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. I.N.S., 779 F.2d 1260, 1265 (7th Cir. 1985)).

A-1290-22

Likewise, under Rule 4:42-2(b), interlocutory orders are "subject to revision at any time before the entry of final judgment in the sound discretion of the court in the interest of justice." See also Lombardi v. Masso, 207 N.J. 517, 536 (2011) (noting that reconsideration of an interlocutory order before final judgment is a matter committed to the sound discretion of the trial court); Lawson v. Dewar, 468 N.J. Super. 128, 134 (App. Div. 2021) (explaining that Rule 4:42-2's approach to reconsideration is a liberal one, guided only by "sound discretion" and the "interest of justice"). In contrast, we owe no deference to the trial judge's legal conclusions and examine them under a de novo standard of review. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). Here, we discern no abuse of discretion in the judge's ruling compelling Costa to appear in New Jersey for a deposition and no mistaken understanding of the applicable law.

Defendants contend the judge's order compelling Costa's appearance without compliance with Swiss law violates Swiss law and the Hague Convention. The Hague Convention "allows judicial authorities in one signatory country to obtain evidence located in another signatory country 'for use in judicial proceedings, commenced or contemplated.'" Tulip Computs. Int'l B.V. v. Dell Comput. Corp., 254 F. Supp. 2d 469, 472 (D. Del. 2003) (quoting

Hague Convention art. 1). Both the United States and Switzerland are current signatories to the Hague Convention, with Switzerland signing in 1995. See Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa, 482 U.S. 522, 524 (1987); ABA Antitrust Law Section, Obtaining Discovery Abroad 367 (3d ed. 2020) [hereinafter ABA, Obtaining Discovery Abroad].

The United States Supreme Court has expressly rejected the notion that the Hague Convention's discovery procedures control the discovery of foreign litigants before an American court. Société Nationale, 482 U.S. at 529. Instead, "the text of the Evidence Convention, as well as the history of its proposal and ratification by the United States, unambiguously supports the conclusion that it was intended to establish optional procedures that would facilitate the taking of evidence abroad." Id. at 538. The Court stressed "[a]n interpretation of the Hague Convention as the exclusive means for obtaining evidence located abroad would effectively subject every American court hearing a case involving a national of a contracting state to the internal laws of that state." Id. at 539.

Federal courts "commonly apply the U.S. Federal Rules of Civil Procedure instead, particularly if granting of judicial assistance according to the Hague Evidence Convention seems unlikely." ABA, Obtaining Discovery Abroad 367. In New Jersey, the state court rules "pertaining to notices of

depositions and compelling discovery are modeled after the Federal Rules of Civil Procedure and are substantially the same." D'Agostino, 242 N.J. Super. at 273 (citing Pressler, Current N.J. Court Rules, cmts. on R. 4:14-1, 4:14-2, and 4:23-1 (1990)). In fact, both federal and state courts routinely order the depositions of a foreign corporation's agents or executives on American soil as expressly contemplated by Société Nationale. See Toyota Motor Corp. v. Super. Ct., 130 Cal. Rptr. 3d 131, 146-48 (Cal. Ct. App. 2011) (Klein, P.J., concurring) (collecting cases), as modified by order (July 28, 2011); D'Agostino, 242 N.J. Super. at 273.

Pertinent to this appeal, there is ample precedent for ordering a deposition to occur outside of Switzerland without offending foreign judicial sovereignty. See Schindler Elevator Corp. v. Otis Elevator Co., 657 F. Supp. 2d 525, 530 (D.N.J. 2009) ("There is no affront to Swiss sovereignty by virtue of a deposition in New Jersey or at some convenient location outside of Switzerland."); see also, e.g., In re Petition of Boehringer Ingelheim Pharms., Inc., 745 F.3d 216, 221-22 (7th Cir 2014) (collecting cases where courts have ordered foreign nationals and residents to appear for depositions in the United States).

Defendants rely on Article 271 of the Swiss Criminal Code to support their contention that the judge's order "would potentially subject the deponent and the

attorneys to criminal prosecution in Switzerland." Under Article 271, paragraph 1, of the Swiss Criminal Code, it is an offense for anyone to take evidence or conduct any activities relating to pretrial proceedings "on Swiss territory without lawful authority," because "such activities are the responsibility of a public authority." ABA, Obtaining Discovery Abroad 390 n.132. Although Article 271 applies to the taking of depositions in Switzerland, whether in person or via electronic means, it does not apply to a New Jersey court compelling a deposition in New Jersey. See ABA, Obtaining Discovery Abroad 391.

Defendants renew their argument that D'Agostino is no longer good law because it was decided before Switzerland signed onto the Hague Convention. According to defendants, because Switzerland now has a procedure to depose witnesses in Switzerland, "it is no longer 'impossible' to conduct such a deposition," rendering D'Agostino moot. However, Switzerland's status in the Hague Convention was not the dispositive factor in D'Agostino.

There, in upholding the trial court's order compelling the production of the requested foreign-based executives of the defendants' subsidiaries, we recognized that "[w]hen peculiar circumstances exist that warrant the taking of depositions outside the jurisdiction where the deponent resides, or at a location other than the corporation's principal place of business, then a court may order

16

depositions be taken elsewhere." 242 N.J. Super. at 277. We stated that these "peculiar circumstances" include "the relative financial burdens of the parties to the litigation," "a sufficiently close relationship" between the corporations to establish "[t]he requisite element of control," whether "taking depositions in New Jersey would result in a substantial disruption of the proposed deponents' lives and work," as well as the inability of the plaintiff "to take depositions in Switzerland where several of the witnesses [were] located." Id. at 276-77.

After balancing the factors, we concluded that the circumstances weighed in favor of the plaintiff. Id. at 277-78. We pointed out that "[a]ll of the foreign-based executives of J & J's subsidiaries [were] within J & J's control" and we "[did] not perceive that requiring them to come to New Jersey where J & J has its corporate headquarters [was] an excessive burden." Id. at 277. "Indeed [the] defendants concede that one or more of the deponents are expected to appear voluntarily in New Jersey as trial witnesses, and that when business requires foreign executives are summoned to New Jersey." Ibid. Further, although the plaintiff sought "to depose upper echelon executives," he did not "wish to examine all the executives of a single company" and "[t]here [was] no indication that J & J's foreign subsidiaries could not continue to function normally during the absence of the executives." Id. at 278. We stressed that "[t]he mere fact that

17

a person requested for deposition is a busy executive is not enough to bar that person's examination." Ibid.

Here, as in D'Agostino, the balancing of the factors weighs in plaintiff's favor. Although a procedure exists for a Swiss deposition, we agree with the judge that the procedure "is still cumbersome, expensive, and time consuming." Although the judge made no specific findings regarding the parties' financial positions, it is clear from the record that defendants are part of a multi-national conglomerate of corporations. Costa certified that his employer, Nestlé Enterprises, has "hundreds of thousands of employees," and that he is currently responsible for business operations across numerous Central and South American countries. In contrast, during oral argument, plaintiff's counsel described plaintiff as "out of work." Further, plaintiff is only seeking to depose one foreign corporate officer who has acknowledged a relevant conversation with plaintiff, as alleged in her complaint, but recalls a different narrative. As in D'Agostino, the judge correctly found "no showing on this record that requiring a single executive of a large organization to appear for a deposition would be unduly burdensome or would interfere with the operation of his direct employer or the enterprise as a whole."

Finally, defendants contend that even if D'Agostino is still good law, the judge erred in ruling that defendants have control over Costa because he is employed by a different company, and neither he nor the company are named parties in the complaint. "Although the [court] rules do not specifically state that a proposed corporate deponent must be under the control of the corporate party in order to require the deponent's presence, such control must exist before a party can be compelled to produce a deponent." D'Agostino, 242 N.J. Super. at 273. Thus, "control by a corporate party over its officers, directors and managing agents is implicit within the rule." Ibid. (citing R. 4:14-2(c)).

In D'Agostino, in challenging the order compelling production, the defendants made a similar argument as here. There, they argued that the non-party foreign subsidiaries and their executives noticed for depositions "were separate legal entities, the individuals were unrelated to the case . . . and were prohibited from participating in depositions under Swiss law." Id. at 270. In rejecting the defendants' argument, we pointed to the fact that the defendants were corporate parents of the wholly-owned subsidiaries, "own[ed] all the stock of the subsidiary corporations whose executives [were] subject to depositions[,] . . . share[d] in financial arrangements[,] and report[ed] back to J & J headquarters in New Jersey." Id. at 274-76. Further, we noted that "one of the

proposed deponents offered a certification in favor of defendants at the outset of the case," thus "participat[ing] in the proceedings." Id. at 275. We concluded there was a "sufficiently close relationship between J & J and its wholly-owned subsidiaries to require it to produce the requested foreign-based executives." Id. at 276.

Here, we agree with the judge that even if defendants are not the corporate parents of Costa's employer, "they are at minimum affiliated sister corporations" and "possessed sufficient control over Mr. Costa to secure a [c]ertification from him." Indeed, Costa submitted not one but two certifications in this case. We acknowledge that certifications are regularly used in legal proceedings, and often-times, individuals voluntarily agree to provide certifications even though the parties hold no control over them. See State v. Angelo's Motor Sales, Inc., 125 N.J. Super. 200, 206-07 (App. Div. 1973) (recounting the history of Rule 1:4-4(b), describing certifications "as a convenience for attorneys and the parties involved" and not a degradation of "the solemnity of the affirmation of the truth" but "another way of swearing or affirming"), aff'd sub nom. State v. Parmigiani, 65 N.J. 154 (1974).

Moreover, there is legal support for the proposition that a subsidiary cannot exercise control over a parent company's employees. See, e.g.,

Volkswagen of Am., Inc. v. Super. Ct., 96 Cal. Rptr. 205, 207 (Cal. Ct. App. 1971) ("While it may be argued that a parent controls a subsidiary corporation and its employees for discovery purposes, it is unlikely that a subsidiary controls its parent."). Nonetheless, in the circumstances of this case, there are sufficient facts in the record to support the judge's decision that defendants had a sufficiently close relationship with Nestlé Enterprises such that defendants would be able to produce Costa for a deposition in New Jersey.

Critically, Costa's role in the corporate structure was not one of a neutral, non-party witness. On the contrary, the record contains ample evidence of Costa's direct oversight of defendants' corporate operations and the supervisory relationship Costa had with defendant Partyka. Indeed, we granted the parties' respective motions to supplement the record with depositions taken after the entry of the order being appealed. In Partyka's deposition, he confirmed that Gerber was a Nestlé company and employees of Nestlé in Switzerland provided "global support functions" for Gerber. Partyka explained that several corporate functions were actually handled by Nestlé USA, with the costs allocated back to Gerber. In particular, corporate policy was set by "the larger" Nestlé corporate entity.

21

Partyka acknowledged that he had virtual meetings with Costa "on a weekly basis." Then, when Costa was in town "maybe two or three times a year," Partyka and Costa would meet to talk about the business. Partyka would also "go to Switzerland [to meet Costa] two or three times a year." Jose Cabrera, who had been promoted to the position plaintiff had sought, was also deposed. During his deposition, Cabrera, who had been promoted with Costa's endorsement, averred that when he decided to eliminate plaintiff's position, he needed approval from Partyka, who needed approval from Costa. Both ultimately approved plaintiff's termination, and Costa was involved in reviewing plaintiff's severance package. Cabrera testified that he had had several conversations about plaintiff with Costa, both before her termination and afterwards during one of Costa's visits to the United States. Given Costa's status in the corporate conglomerate and role in relation to the litigation as well as the intertwinement of the business entities, we agree with the judge's decision to compel Costa's deposition in New Jersey.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1290-22